United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 26, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 02-40285

———————————

UNITED STATES OF AMERICA, EX. REL. IRVIN WILLARD,

Plaintiff-Appellant,

versus

HUMANA HEALTH PLAN OF TEXAS INC., ET AL.

Defendants,

HUMANA HEALTH PLAN OF TEXAS INC.; HUMANA INC.,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Before GARWOOD, JONES and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

In this *qui tam* action, the United States of America, through
its relator Irvin Willard (Willard), appeals from the judgment of
the district court, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b),
dismissing the second amended complaint filed against Humana Health

Plan of Texas, Inc. and Humana, Inc. (Humana) alleging Humana violated the False Claims Act, 31 U.S.C. § 3729, et seq. (FCA). We affirm.

**Facts and Proceedings Below**

Humana, Inc., through its subsidiary Humana Health Plan of Texas, Inc., operates health maintenance organizations in various counties in Texas. Humana entered into contracts with the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services to provide health care services to Medicare beneficiaries. Humana is paid a fixed rate for each enrollee, determined annually, based on the average anticipated Medicare expenses of all Medicare-eligible individuals in a given geographic area, generally on a county-by-county basis. These rates are referred to as capitation rates.

Willard worked as a sales representative for Humana from 1995 through 1998, selling Humana's Medicare HMO products. During this time, Humana operated an HMO for Medicare beneficiaries in a Houston service area comprised of Harris, Austin, Colorado, Fayette, and Waller counties. Harris County encompasses the metropolitan Houston area, while the other counties are comprised of more rural areas.

An HMO under contract with the HCFA may not discriminate in enrollment on the basis of health, or on any other basis used as a proxy for health. *See* 42 U.S.C. § 1395mm(i)(6)(a)(iv); 42 C.F.R.

2

§ 417.428(b)(1). Willard contends that, fairly read, its Second Amended Complaint alleges that Humana engaged in a "cherrypicking" scheme "whereby less healthy potential program participants and those living in counties outside Humana's favored geographic area were methodically discouraged from joining Humana's HMO." Willard alleged in his complaint that Humana adopted a variety of techniques to prevent eligible participants from learning they can join Humana's HMOs. Willard further alleged that he was "told that Humana only wanted to insure healthy people, and would lose money if it enrolled sick people or people who lived too far from Humana's established providers." Willard asserts that when he persisted in soliciting and enrolling people from the outlying counties, he was warned not to do so, and was ultimately fired.

Willard contends that in order for Humana to gain entry into the lucrative Houston market, HCFA required that Humana serve the outlying counties. In his complaint, Willard alleged that "[w]ithout revealing its intentions to either relators or HCFA, Humana Texas entered [into] contracts to serve those counties with no intention of actually enrolling Medicare participants there."

In May 1999 Willard filed a *qui tam* complaint under the FCA against Humana and other HMOs. The Government elected not to intervene. Thereafter, in May 2000 Willard filed his First Amended Complaint and Humana filed a motion to dismiss Willard's First Amended Complaint pursuant to Federal Rules of Civil Procedure

3

12(b)(6) and 9(b), and challenged the constitutionality of the FCA's *qui tam* provision. On August 10, 2000, Judge Kent stayed the case pending this court's *en banc* decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) (en banc), in which this court upheld the constitutionality of the FCA's *qui tam* provision. At a July 2001 status conference following the *Riley* decision, Humana reasserted its request for Willard to plead fraud with specificity. Judge Kent granted Willard leave to amend his complaint and allowed Humana to reassert its non-constitutional grounds for dismissal. Willard filed his Second Amended Complaint later in July 2001.

On July 30, 2001, the case was transferred to Judge Lake. Humana filed a renewed motion to dismiss Willard's Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(B) and Willard moved for partial summary judgment. Judge Lake granted the motion to dismiss and denied the motion for summary judgment as moot. Willard appeals the district court's grant of the motion to dismiss, as well as the district court's denial of leave to amend his complaint.

**DISCUSSION**

*I. Standard of Review*

We review a Rule 12(b)(6) motion *de novo* and accept all well-plead factual allegations as true. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). "[T]he central issue is

4

whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 477 (5th Cir. 2002). "Under Rule 12(b)(6), a claim maybe dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle him to relief" and "the court accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). However, "conclusory allegations . . . will not suffice to prevent a motion to dismiss," *id.*, and neither will "unwarranted deductions of fact." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).

We review the district court's denial of leave to amend the complaint for abuse of discretion. *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727-28 (5th Cir. 1998).

*II. Dismissal of Willard's Claims*

Willard's Second Amended Complaint alleges that Humana violated 31 U.S.C. § 3729(a)(1) and (a)(2). Section 3729 states in relevant part:

"Any person who: (1) knowingly presents, or causes to be

5

presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . is liable to the United States Government for a civil penalty . . ."

Willard contends that Humana engaged in a "cherrypicking" scheme which violates the FCA in three distinct ways. First, Willard argues that because Humana is paid based on the average expenses for all Medicare-eligible individuals, covering both healthy and sick beneficiaries, Humana effectively overcharged the Government for Medicare services by "cherrypicking" which beneficiaries it would target for enrollment. Secondly, Willard claims that by seeking payment under the Medicare program, Humana falsely represented (impliedly certified) compliance with all material terms, statutes, and regulations central to the Medicare HMO program. Finally, Willard argues that Humana procured its contract with the HCFA by fraud in the inducement because Humana never intended to provide services in the outlying counties.

III.  *Overcharging Theory of Liability*

Willard argues that when Humana receives payment at the pre-established "capitation rate" for healthier enrollees, this rate includes compensation for providing services to those individuals, as well as a "premium" to offset anticipated costs it expects to incur from providing services to less healthy persons. Willard

6

contends that by not providing services to less healthy persons under its "cherrypicking" scheme, Humana is effectively overcharging the Government in violation of the FCA.

Humana persuasively argues that any alleged discrimination by way of a "cherrypicking" scheme must occur *within* the population for which uniform rates have been set. Humana asserts, and Willard agrees, that the rates in this case are determined on a county-by-county basis. Therefore, Willard must allege discrimination based on health status within a single county, not discrepancies in enrollment patterns among different counties, in order to establish that Humana overcharged Medicare. As such, Willard's overcharging theory of liability must fail because Willard has not alleged discrimination based on health status within any particular county, i.e. rate area.

As Humana's capitation reimbursement rates were adjusted to each county, the district court properly concluded that Humana accrued no unwarranted benefit and the government no loss by virtue of Humana enrolling more beneficiaries in some counties than others. The district court also properly concluded that it was undisputed that all claims submitted by Humana were valid. Moreover, the district court found that Humana's contract with the government did not obligate it to take affirmative steps to enroll beneficiaries in all counties. Perhaps most importantly, the trial court correctly found:

> "Willard has also failed to state a cause of action under
> 31 U.S.C. § 3729(a)(2). Under section 3729(a)(2), the
> plaintiff must identify both a false claim and a false
> record or statement made or used to get that false claim
> paid. *Thompson [v. Columbia/HCA Healthcare Corp.]*, 125
> F.3d [899] at 903 [5th Cir. 1997]. As explained above,
> Willard has not identified a false claim. Moreover,
> Willard has not identified any other document or
> statement used to get an allegedly false claim paid."

The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("The statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.' . . . Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government.") (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).

Because Willard does not allege that any of the claims were false in the sense that they contained false statements or were for services not performed or the like, Willard must resort to either the "implied certification" or "fraud in the inducement" theories of liability through which it may be possible to demonstrate that otherwise valid claims are actionable under the FCA.

IV. *"Implied Certification" Theory of Liability*

8

In order to receive payment, Humana submits enrollment lists to HCFA identifying the persons enrolled in its HMO program for any given month. Willard does not allege that those enrollment lists were literally "false," in that they requested payment for individuals not enrolled or not eligible for enrollment. Rather, Willard argues that by requesting payment, Humana has impliedly represented to the Government that it has complied with applicable statutes and regulations central to performance of Humana's contract with HCFA, as well as the terms of the contract. Willard further argues that by requesting payment, Humana impliedly represented that the Government received everything it had contracted and bargained for. As there was no express certification of compliance, Willard contends that Humana made an "implied certification" of compliance which the Government relied upon.

This court has recognized that "services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA." *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). This court, however, has also recognized that the FCA "interdicts material misrepresentations made to qualify for government privileges or services." *Id.* (quoting *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. 1977)). While this Circuit has decided cases dealing with FCA liability based on express certifications of

9

compliance with various statutes and regulations, we have not specifically addressed whether FCA liability can be based on an "implied certification" theory.

Willard relies on the Tenth Circuit's decision in *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000), to support recognition of FCA liability based on an implied certification theory. The defendant in *Shaw* had contracted to perform photography services for the Government. *Id.* at 523. Under the contract, the defendant was required to dispose of certain chemicals used in the contracted for film processing in accordance with environmental guidelines and standards. *Id.* at 527. The United States, appearing as *amicus curiae*, argued that by submitting monthly invoices for the photography services, the defendant:

> "impliedly certified that it had complied with the silver recovery [environmental compliance] provisions in the contract; because [the defendant] was being paid not only for photography services but also for environmental compliance, its false implied certification of compliance with the contract's silver recovery requirement gives rise to liability under the FCA. *Id.* at 531.

The Tenth Circuit embraced the implied certification theory of FCA liability, noting that it is consistent with the legislative history of the 1986 amendments to the FCA and supported by the language and structure of the FCA itself. *Id.* at 530. The district court found *Shaw* unpersuasive, stating that:

> "Although the court used the phrase 'implied

10

certification,' the court did not create or recognize a new or expanded cause of action under the False Claims Act. 'Implied certification' amounts to nothing more than an alternative expression of the well-accepted idea that billing the government for something not delivered may constitute a false claim. If the government defines its bargain in a manner that requires adherence to a statute or regulation, compliance with that statute or regulation is implied by virtue of a request for payment. As with a claim brought under the theory of express certification, there can be no liability based upon an implied certification unless compliance is a condition for payment." (citations omitted).

As the district court explained, "[t]he Tenth Circuit held that submission of the invoices constituted a false claim because the payment requested was for both photography services and for silver recovery activities, but the silver recovery had not been performed." Thus, the critical point is that an action on which payment was conditioned had not been performed. Other circuits that have recognized the "implied certification" theory have also set forth this requirement. *See United States ex rel. Augustine v. Century Health Svs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002) (adopting the implied certification theory, explaining that FCA liability "can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned"); *Mikes v. Strauss*, 274 F.3d 687, 700 (2d Cir. 2001) (concluding that "implied false certification is appropriately applied only when the underlying statute or regulation . . . *expressly* states the provider must comply in order to be paid"); *United States ex rel. Siewick v. Jamieson Science & Eng'g, Inc.,* 214 F.3d 1372, 1376

11

(D.C. Cir. 2000) (holding that courts will "infer certification from silence, but only where certification was a prerequisite to the government action sought").

This court need not determine here whether it will recognize the "implied certification" theory, because even if assuming for the sake of argument we were to apply such a theory here, Willard would still lack a cognizable claim for two reasons. First, Willard has failed to allege facts that would show that HCFA *conditioned its payment* to Humana on any implied certification of compliance with the anti-discriminatory regulations.

It is clear that compliance with the regulations Willard alleges Humana violated was not a condition of payment under the contract. If Humana engaged in any practice that "would reasonably be expected to have the effect of denying or discouraging enrollment" based on health status, the Government is merely authorized to suspend future enrollment, suspend *future* payments, or impose monetary penalties, rather than withhold payment for those already enrolled. *See* 42 U.S.C. § 1395mm(i)(6). *See also United States v. Southland Management Corp.*, 326 F.3d 669, 676 (5th Cir. 2003). Moreover, Willard does not allege that the regulations concerning discrimination based on health status and income were referenced in the contract. A review of the standard contract with Medicare HMO providers submitted by Willard indicates that neither *42 U.S.C. § 1395mm(I)(6)* or *42 C.F.R. § 417.428(b)(1)* were

12

mentioned in the contract, let alone their compliance certified as a condition for payment, despite the fact that compliance with numerous other regulations, some of which are specific to health care providers and others of which relate to labor more generally, was incorporated either within the contract itself or in its appendix.

Second, Willard has not alleged facts sufficient to reflect that there was any regulatory violation. Willard does not allege that Humana turned away healthy people or discouraged less healthy Medicare eligible people *per se* from participating in the program. Under 42 U.S.C. § 1395mm(i)(1), civil penalties may be imposed if a Medicare contracting HMO engages in any practice that would reasonably be expected to have the effect of denying or discouraging enrollment by eligible individuals whose medical condition or history indicates a need for substantial future medical service. However, while Willard alleges that Humana supervisors stated, as a matter of fact, that the company does not profit by insuring the sick, Willard does not allege that Humana in fact implemented a policy or practice of actually discouraging less healthy individuals from enrolling or actually turning them away. The complaint never alleges that either Willard or any of his coworkers at the behest of Humana either actually turned away any less healthy eligible individuals or actually discouraged any from enrolling. Indeed, the complaint does not even allege that Willard

13

and other agents responsible for enrolling prospective beneficiaries examined their medical histories or conducted an evaluation of their future need for medical services.

Willard merely claims Humana accomplished a similar ultimate result *de facto* by less aggressively marketing its plan in the rural counties as compared with Harris County. However, Willard does not allege that the Medicare eligible population in the rural counties is less healthy on average than that in Harris County. Even if this is assumed, the undisputed fact that reimbursement rates are calibrated separately for each county means that such a practice would not unduly benefit Humana or harm the Government.

Willard comes closer to alleging a regulatory violation under 42 C.F.R. § 417.428(b)(1), which prohibits, "[p]ractices that are discriminatory. For example, the HMO or CMP may not engage in any activity intended to recruit Medicare beneficiaries from higher income areas (usually an indicator of better health) without making a comparable effort to enroll Medicare beneficiaries from lower income areas." However, Willard never alleges that the rural counties are lower income areas than Harris County. Although an argument could perhaps be made that the general provision of 42 C.F.R. § 417.428(b)(1) might be construed to include discrimination between urban and rural areas in the aggressiveness of marketing efforts, Willard does not make this allegation, let alone cite any authority or precedent supporting such a construction. Furthermore, in light of the parenthetical reference to residents of higher

14

income areas generally having better health and the overarching concern of discrimination between healthy and sick patients that could undermine the capitation rate scheme, the lack of any obvious and general correlation between urban and rural status and health would suggest that this classification would not be a regulatorily recognized proxy for health. Even to the extent urban and rural differences affect health, so long as any marketing differences occur on a county-by-county basis as opposed to distinguishing between urban and rural areas that might lie within one county, the latter of which is not alleged, the fact that capitation rates are set county-by-county means *ipso* facto the government cannot be shortchanged.

Finally, even if we were to find that Humana was under a contractual or regulatory obligation to enroll beneficiaries on a proportionate basis in every county, Willard's complaint fails because it does not allege Humana enrolled a lower percentage of Medicare eligible beneficiaries in the rural counties as compared with Harris County.[1]

*V. Fraud in the Inducement Theory of Liability*

Entering into a contract with no intention of performing may

---

[1]Even if we assume that Willard properly incorporated his motion for summary judgment filed *after* his second amended complaint into that complaint, neither this deficiency in his complaint or any of the other deficiencies cited by the district court or in this opinion are cured by Willard's summary judgment motion.

15

constitute fraud in the inducement.  FCA liability has in certain cases been imposed when the contract under which payment is made was procured by fraud.  *See Harrison v. United States*, 176 F.3d 776, 787 (4th Cir. 1999), citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943), as the most prominent of cases in which FCA liability was imposed when the contract "was obtained originally through false statements or fraudulent conduct."

Willard argues that his complaint states a valid claim under the FCA based on the theory of fraud in the inducement because Humana "entered [into] contracts to serve [the outlying] counties with no intention of actually enrolling Medicare participants there."  The district court held that Willard's fraud in the inducement claim failed to comply with the particularity in pleading requirement imposed by Rule 9(b) of the Rules of Civil Procedure.

The requirements of Rule 9(b) apply to claims under the FCA. *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997), *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476 (2d Cir. 1995).  Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  This court has stated that Rule 9(b) requires that the plaintiff allege "the particulars of time, place, and contents

16

of the false representations," *Williams v. WMS Techs.,* 112 F.3d 175. 179 (5th Cir. 1997), as well as the identity of the person making the misrepresentation and what that person obtained thereby, otherwise referred to as the "who, what, when, where, and how" of the alleged fraud. *Thompson*, 125 F.3d at 903.

Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Fed. R. Civ. P. 9(b). This second sentence of Rule 9(b) "relaxes the particularity requirement for conditions of the mind, such as scienter." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). As this court has explained, in order to adequately plead scienter, "a plaintiff must set forth specific facts that support an inference of fraud." *Id.* Facts that show a defendant's motive to commit the fraud may sometimes provide a factual background adequate for an inference of fraudulent intent. *Id.*

The district court observed that Willard's fraud in the inducement claim is a "one-sentence allegation, devoid of any factual information that arguably did not even meet the pleading requirements of Federal Rule of Civil Procedure 8(a), and certainly [did] not meet the requirements of Rule 9(b)." The district court noted:

> "Willard does not assert a single fact to support his allegation that Humana entered into a contract with the HCFA with no intent to perform it. Willard does not allege who was involved in the negotiations, or where or when the negotiations took place, or that he has any basis for his allegation. Willard does not allege any

17

facts as to what was said before, during, or after the contract negotiations to indicate that the contract was entered with no intent on Humana's part to enroll eligible participants from rural counties."

At best, Willard arguably complied with the loosened 9(b) requirement as to state of mind. Although Willard's complaint offered no specificity relevant to Humana's intent at the time when the contract was entered into, Willard did offer subsequent statements of Humana officials suggesting they were strongly averse to serving the rural counties. However, the trial court correctly held that Willard did not come close to setting forth the particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby," otherwise referred to as the "who, what, when, where, and how" of the alleged fraud. Willard merely makes a general assertion that Humana had to agree to serve the rural counties in order to obtain the contract, although Willard does not assert this commitment was ever memorialized in writing. Willard does not allege when or how this commitment was made or who at Humana made it.

It is true that the pleading requirements of Rule 9(b) may be to some extent relaxed where, as is arguably the case here, the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge. *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). Although we have held that fraud may be pleaded on information and belief under such circumstances, we have

18

also warned that this exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Id.* at 350 n.67. In addition, even where allegations are based on information and belief, the complaint must set forth a factual basis for such belief. *Id.*

First, Willard failed to argue in his briefs to this court that the facts were peculiarly within Humana's knowledge and therefore his pleadings should have been held to a lower standard by the district court on the issue of fraud in the inducement. Second, even if this court were inclined to consider this argument *sua sponte*, Willard's one-sentence allegation fails to set forth a factual basis even upon information and belief that provides the particularity required by Rule 9(b).

In addition, this court may consider alternative grounds for upholding the district court's decision. *Henderson v. Century Fin. Co., Inc.*, 577 F.2d 997, 1002 n. 5 (5th Cir.1978). We observe that Willard's fraud in the inducement theory also fails to state a cognizable claim because there is no regulatory violation. In *United States v. Shah*, 44 F.3d 285, 293 (5th Cir. 1995), this court noted, "Generally, "there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed." (footnote omitted). *See also* Restatement (Second) of Torts § 530(1). However, where substantial nonperformance is coupled with other probative factors, such as

19

"where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances," an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred. 37 Am. Jur. 2d, Fraud and Deceit, § 478 (footnotes omitted)." *Shah*, 44 F.3d at 293 n.14.

Therefore, the requisite intent must be coupled with prompt, substantial nonperformance to demonstrate fraud in the inducement. It must be shown that the defendant promptly followed through on its intent not to perform by substantially failing to carry out its obligations under the contract. Willard has not alleged that no Medicare eligible participants were enrolled by Humana in the rural counties or that the percentage of Medicare eligible participants enrolled in the rural counties was lower (much less substantially lower) than that in Harris County. It would be illogical to find fraud where a party secretly did not intend to perform the contract when it was signed, but in actuality did perform, as the civil law generally regulates actions, not thoughts alone. This requirement is also necessary because the government must suffer an injury in fact for there to be standing. *Berge v. Bd. of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1458 (4th Cir.), cert. denied, 118 S. Ct. 301 (1997). Clearly, an intention devoid of an action cannot cause an injury in fact.

Accordingly, in addition to Willard's fraud in the inducement

claim not passing the Rule 9(b) bar, the claim is also deficient in light of the district court's correct determination that Willard failed to state a cognizable claim that Humana violated an applicable regulation or provision of the contract.[2]

*VI. Failure to Grant Willard Leave to Amend Complaint for Third Time*

Willard argues that the district court erred by dismissing his Second Amended Complaint in part based on Fed. R. Civ. P. 9(b) without granting him another opportunity to amend. The district court stated that "Willard has not requested leave to amend his complaint to remedy this failure."

Under Rule 15 (a), "leave to amend shall be freely given when justice so requires," and should be granted absent some justification for refusal. *Foman v. Davis*, 83 S.Ct. 227, 230 (1962). The liberal amendment policy underlying Rule 15 (a) affords the court broad discretion in granting leave to amend and, consequently, a motion for leave to amend should not be denied unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment, . . . " *Foman*, 83

---

[2]We should not be understood as *holding* that, apart from the defects we have noted in the text, a fraud in the inducement claim of the general sort urged by Willard would support an FCA claim (particularly one the United States has declined to pursue) in circumstances similar to these. We merely so assume *arguendo*.

S.Ct. at 230.

Except as authorized by the first sentence of Fed. R. Civ. P. 15(a) for one amendment before service of a responsive pleading, a complaint may be amended only by leave of the district court, and, while such leave is to be freely given when justice so requires, the decision is left to the sound discretion of the district court and will only be reversed on appeal when that discretion has been abused. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 91 S. Ct. 795, 802 (1971); *Dunn v. Koehring Co.*, 546 F.2d 1193, 1198 (5th Cir. 1977).

A party who neglects to ask the district court for leave to amend cannot expect to receive such a dispensation from the court of appeals. *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 183-84 (1st Cir. 1997). Rule 15(a) applies where plaintiffs "expressly requested" to amend even though their request "was not contained in a properly captioned motion paper." *Ballisteri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (5th Cir. 1988). A formal motion is not always required, so long as the requesting party has set forth with particularity the grounds for the amendment and the relief sought. Fed. R. Civ. P. 7(b)(1), 15(a); *Edwards v. Occidental Chemical Corp.*, 892 F.2d 1442, 1445-46 (9th Cir. 1990). "[A] bare request in an opposition to a motion to dismiss - without any indication of the particular grounds on which the amendment is sought, *cf*. Fed. R. Civ. P. 7(b) - does not constitute a motion

within the contemplation of Rule 15(a)." *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993).

For several reasons, the district court did not abuse its discretion in not allowing Willard to amend his complaint for a third time. First, Willard did not expressly request with particularity the opportunity to amend his complaint for the third time. Willard points to the following sentences on page 20 of his Response to Humana's Second Motion to Dismiss:

> "In any event, the only relief possibly available to it at this stage of the case is that relator replead. A court should not dismiss a plaintiff's complaint under Rule 9(b) unless the plaintiff has already been given the opportunity to amend. *Hart v. Bayer Corp.*, 199 F.3d 239, 247, n.6 (5th Cir. 2000); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476 (2nd Cir. 1995)."

While Willard need not necessarily have filed a separate Rule 15 motion to amend, this brief statement does not expressly request that Willard be given leave to amend and does not provide any indication of the grounds on which such an amendment should be permitted. Following the district court's order dismissing the case, Willard did not file a motion to reconsider as part of which he could have moved to amend his complaint.

Additionally, leave to amend properly may be denied when the part seeking leave has repeatedly failed to cure deficiencies by amendments previously allowed and when amendment would be futile. *Foman*, 83 S.Ct. at 230. Here, Willard has already had two opportunities to amend the complaint. The record indicates that the

second instance in which the district court granted Willard leave to amend was to cure the complaint's lack of specificity, which is the same basis on which Willard now argues he should be allowed to amend for a third time.

Finally, it appears that a third chance to amend would prove to be futile. First, there is no indication in Willard's briefs to this court that he will be able to allege the necessary "who, what, when, where, and how" of the alleged fraud. Furthermore, because Willard has failed to make a cognizable claim that Humana violated its contract or an applicable regulation, Willard's fraud in the inducement claim cannot be sustained independent of Rule 9(b).

## CONCLUSION

For the reasons stated, the district court's judgment dismissing the action is

AFFIRMED.